JOSEPH V. DALEY, as Administrator of the Estate of JOHN E. DALEY, Deceased, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 27916)

Third Department, May 5, 1948.

*Brady & Brady*, attorneys (*Joseph J. Casey* of counsel), for appellant.

*Nathaniel L. Goldstein, Attorney-General (Wendell P. Brown, Solicitor-General, John R. Davison, Ronald E. Coleman, Assistant Attorneys-General*, of counsel), for respondent.

HEFFERNAN, J.   John E. Daley, claimant's son, was born on November 6, 1913, and was twenty-nine years of age at the time of his death on August 22, 1943.

After completing his education in an elementary school he was gainfully employed in various occupations until August, 1941, when he manifested mental disturbances.  He then entered the psychiatric ward of an Albany hospital.

On August 22, 1941, he was adjudged to be a person of unsound mind and was committed to the Hudson River State Hospital for Mental Defectives at Poughkeepsie, New York, where he was admitted on August 23, 1941.  After his admission to the hospital the patient was examined by Dr. Lewis, one of the physicians on the hospital staff and its supervising psychiatrist, and was found to be suffering from dementia praecox, paranoid type.  While confined in the hospital he made an unsuccessful attempt to escape of which fact the hospital authorities had notice.

On May 3, 1942, the young man was released from the hospital and paroled in the custody of his father.  His mental condition at that time was described in the hospital record as

" improved ". After his release from the hospital decedent obtained employment at the Port of Albany. Later and about July 30, 1942, he entered as an apprentice seaman in the United States Navy and was trained at the Great Lakes Naval Station, Illinois. Subsequently he was transferred to Norfolk, Virginia, and was there assigned to the U. S. S. *Electra.* He received a rating of seaman second class V-6 and was honorably discharged from service on February 22, 1943.

The Naval records disclose that while aboard ship decedent became moody, depressed and withdrawn and that while in this condition he jumped overboard on October 3, 1942. On the same day he was admitted as a patient to the Norfolk Naval Hospital at Portsmouth, Virginia. At that hospital his condition was diagnosed as " negativistic, confused and emotionally blunted ". From that institution he was transferred on November 16, 1942, to the United States Naval Hospital at Bethesda, Maryland. At the latter hospital the patient's condition was described as " partially orientated, hallucinated, deluded, suspicious and confused. His insight was lacking and judgment impaired. Institutional care was considered necessary * * * ".

A few days later decedent was transferred to St. Elizabeth's Hospital at Washington, D. C., from which he attempted to escape. On March 16, 1943, he was transferred to the Hudson River State Hospital. St. Elizabeth's Hospital transmitted to the Hudson River State Hospital on April 2, 1943, a complete history of the mental condition of decedent and this history was incorporated in the records of the latter hospital.

The record discloses that on his return to the Hudson River State Hospital decedent was still suffering from dementia praecox, paranoid type.

On the trial Dr. Lewis testified that it was necessary to care for decedent in " a closely supervised ward to which disturbed patients are assigned ". He also said that suicide is to be guarded against in the treatment of a person mentally ill.

On his return to the Hudson River State Hospital decedent was assigned to quarters in Ward 18 which is a semi-disturbed ward and was directed to work in the sorting room in the laundry. The laundry is located in a section of one of the hospital buildings, is reached through a tunnel and is shut off from the rest of the building by an iron gate which is always closed except when anyone enters or leaves the laundry. There was no door on either of the entrances to the sorting room. Directly opposite the sorting room is a lavatory for use of the patients. In this tunnel and about eighty-two feet from the

lavatory the soap room is located. The door of this room was open while the laundry was in operation.

It is undisputed that at about 2 o'clock in the afternoon of April 21, 1943, while decedent was in the soap room of the laundry he either jumped or fell into a vat of boiling soap and died of second and third degree burns at 4:05 A.M. the following morning. Dr. Lewis testified that after the accident the patient was suffering from shock and pain and that at no time between the accident and death did he lose consciousness.

Because of the tragic demise of his son his father as the administrator of his estate instituted this action against the State to recover damages for the wrongful death and also to recover for the conscious pain and suffering of decedent prior thereto on the theory that the negligence of the State caused the fatality.

From a judgment of the Court of Claims dismissing his claim on the merits the appellant has come to this court.

In our opinion the proof as to the State's negligence is conclusive.

The testimony of Dr. Lewis clearly establishes that on the day of the accident decedent required constant supervision. Instead of giving him that protection decedent was permitted to roam at will through the various rooms in the laundry. This witness also said that patients were required to stay in the place assigned to them unless accompanied by an attendant. He further testified that on the day in question decedent's physical condition was excellent but that his judgment was very much impaired. The proof also discloses that when decedent came to his death there were no attendants in the tunnel or soap room. A witness named Conrad, employed by the hospital as chief laundry supervisor, testified that in this particular section of the laundry there were but two attendants, himself and one other named Hickson. Conrad said that at the time of the accident he thought Hickson was in the sorting room where his duties required him to be. Singularly enough the State did not call him as a witness; in fact it swore no witness on its behalf. Conrad also testified that all attendants in the laundry had a mechanical job to perform in connection with its operation. This witness also said that there was no attendant in this part of the laundry to supervise and observe the movements of patients.

On the day of the accident decedent was one of fourteen patients in the sorting room to which he was assigned and in that room on that day there was but one attendant, Hickson.

whose duty it was not only to supervise the patients but also to assist in the operation of the laundry. Conrad said that just prior to the accident he was engaged at work in the washroom and that he had not seen decedent for ten or fifteen minutes before the fatal event.

Under all these circumstances it seems to us that the State was negligent in caring for decedent. It had notice of his suicidal tendencies. It permitted him to remain unattended when he should have been closely supervised. It left unguarded the vat where the disaster occurred. It failed to exercise reasonable care for his supervision (*Curley* v. *State of New York*, 148 Misc. 336, affd. *sub nom. Luke* v. *State of New York*, 253 App. Div. 783; *Martindale* v. *State of New York*, 269 N. Y. 554).

On the question of damages it is not disputed that decedent endured intense pain and suffering from the time of his injuries until death relieved him from further agony. Dr. Lewis testified that decedent, if death had not occurred in the manner in which it did, had a 5 to 10% chance of making a complete recovery — that is a recovery to his state prior to the time of his mental disturbance.

The judgment appealed from should be reversed on the law and facts, with costs to appellant, and the matter remitted to the Court of Claims to make an award of damages in favor of claimant. Certain findings of fact are reversed and new findings made.

HILL, P. J., BREWSTER, RUSSELL and DEYO, JJ., concur.

The judgment of the Court of Claims appealed from is reversed on the law and facts, with costs to appellant and the case remitted to the court below for the fixation of damages in favor of appellant.

The court hereby reverses the following findings of fact contained in the decision of the court below: Nos. 13, 18, 19, 20, 21 and 22.

The court hereby disapproves of and annuls conclusions of law No. 1 contained in such decision.

The court also reverses the following findings of fact made by the court below and contained in the State's requests to find: Nos. 15, 16, 18, 23, 25 and 26.

The court also annuls conclusions of law made by the court below and contained in the State's requests to find: Nos. 1 and 2.

The court adopts the following findings contained in claimant's requests to find and refused by the court below: Nos. 4, 7, 8, 9, 10, 12, 13, 14 and 15.